JOHN J. MULLIN *vs.* PHILADELPHIA, BALTIMORE and WASH-
INGTON RAILROAD COMPANY, a corporation of the State of
Delaware.

*Case — Personal Injuries — Evidence — Contributory Negligence —
Nonsuit Refused — Jury Instructed to return Verdict
for Defendant.*

Upon the evidence presented by the plaintiff a motion for a nonsuit was refused.
Upon the conclusion of the evidence on both sides the jury were instructed to return
a verdict for the defendant.

(*March 4-8, 1904.*)

LORE, C. J., and PENNEWILL and BOYCE, J. J., sitting.

*Levin F. Melson* and *Horace Greeley Knowles* for plaintiff.

*Herbert H. Ward* and *Andrew C. Gray* for defendant.

Superior Court, New Castle County, February Term, 1905.

ACTION ON THE CASE (No. 46, May Term, 1903), to recover
damages for the loss of both legs and other injuries received Octo-
ber 12, 1902, occasioned by being struck by a north-bound pass-
enger train of defendant, and thereby thrown against and under
one of the defendant's south-bound freight trains at the point where
its tracks are crossed by Orange Street in Wilmington.

At the trial William A. Kimmey, a civil engineer and witness
for plaintiff, after stating that he was familiar with the tracks of de-
fendant's road at the scene of the accident, and at the time the
same occurred, there having since been no material change in said
tracks, described the *locus in quo* as follows:

There is a pavement and a curb which measures five feet, ten
inches in width, and then a space between the curb and the first
rail of the south-bound track of two feet, eight inches, then the
tracks measuring in the neighborhood of five feet between from

MULLIN vs. P., B. & W. R. R.          157

EVIDENCE.

out to out, and six feet between the south-bound and north-bound tracks. Then come the other tracks which are six feet apart, the regulation distance. There is a turnout between the two tracks to the south or side below Orange Street that makes a reverse curve. There is a watch-box on the south side with a safety gate arrangement in front of it, and there is also a safety gate on the upper side. Those are both on the company's property. One of the safety gates extends clear across the roadway across Orange Street; the other does not quite reach the opposite side, by three or four feet. The tracks are just the same there as they were in 1902, at that point and for some distance beyond it.

( The witness further testified, in response to questions by Mr. Knowles, of counsel for defendant, as follows ):

Q. Is there a curve or bend in that track near Orange Street? A. There is a turnout that commences about thirty-five or thirty-seven feet west of the westerly side of Orange Street, and the curve commences just beyond Thorn Street.

Q. In squares, how far is that? A. Seventy-six feet is the length of the square from Orange to Thorn. Forty-two feet, six inches is the width of Thorn Street and the curve commences starting from that, no more than ten or twelve feet.

Q. Does it take the track out of sight west of that? A. No, sir; not until you get some distance.

Q. How many squares? A. There is this curve just beyond Thorn Street. You see the curve goes from Tatnall a slight distance. Then there is a tangent or straight line and then another curve beyond West Street.

Q. Does that curve swing the main track out of sight? A. It would, standing between the north-bound and south-bound tracks; a train comes in sight just about one hundred feet beyond the westerly side of West Street.

Q. That is about two and one-third squares from this place ?

A. No, sir; about two squares. One of them is 265 feet and the other is only 190, and then the two streets.

Q. That is a public crossing there at Orange Street, where this accident occurred? A. Yes, sir.

*John J. Mullin,* the plaintiff, being produced, sworn and examined, testified as follows:

*By Mr. Knowles:*

Q. Were you injured in the month of October, about the twelfth day, in this city? A. Yes, sir.

Q. Where were you injured—what place or location? A. Front and Orange.

Q. Do you mean the place where the railroad tracks cross Orange Street? A. I mean the crossing.

Q. What were you doing about the time or just before you were injured? Just state to the jury how you came to be injured? A. Well I was going down Front Street and met my brother-in-law and me and him took a walk down there.

Q. Were you there on the southerly side of the tracks? A. I was standing towards Blumenthal's, there.

Q. South of the Railroad tracks? A. Yes, sir.

Q. Where did you start to go when you left the place there where you said you were? A. I started to go out home.

Q. What direction were you going to take to go out home—how were you going? A. Going toward Front Street.

Q. Do you remember just before you started across the track? A. Yes, sir.

Q. Were the gates up or down? A. Well, to the best of my knowledge, they were up.

Q. Did you see them up? A. I looked before I got there and they were up.

Q. Then what did you start to do? A. Well, I started to go across.

MULLIN vs. P., B. & W. R. R.        159

EVIDENCE.

Q.  And what did you do?   A.  I looked up towards Harlan and Hollingsworth's.

Q.  What did you look up that way for?   A.  To see whether there was anything coming.

Q.  Then what did you do?   A.  Well, about the time I got over there, there was a freight train coming by.

Q.  What direction?   A.  Coming from towards Shipley Street.

Q.  Then what happened?   A.  Well, I kind of stepped back, and the first thing I knowed I got struck in the side.

Q.  What struck you, if you know?   A.  The express train, I guess.

Q.  What track was it coming on?   A.  Coming from the south.

Q.  Did it make a signal or alarm as it approached that crossing?   A.  I never heard no sound, no whistle nor nothing.

Q.  Were you listening?   A.  I was listening.

Q.  About what speed, if you can give any idea, was it running?   Was it running fast or slow when it struck you?   A.  To the best of my knowledge, the way it hit me, it must have been running about thirty miles an hour.

Q.  Do you remember what it did when it struck you, or after it did strike you—do you remember anything?   A.  All I remember was getting knocked up against a freight train.   I don't remember anything else.

Q.  Was the freight train going fast or going slow?   A.  I guess it was going about twelve miles an hour.

X.  I ask you the plain question, when you started back across the tracks towards the northerly side, was there not a freight train going south across that crossing?   A.  After I turned my head, there was a freight train coming by.

X.  When did you look down the tracks towards Harlan's, before you started over or after?   A.  While I was walking across I had my head turned that way.

X.   Before you started out across the tracks, did you look down towards Harlan's?   A. Yes, sir ; when I started across I looked towards Harlan's.

X.   What do you mean by *when* ?   Was it before or after you started across that you looked down towards Harlan's ?   A. When I started to go across.

X.   Do you mean before you started ?   A. When I started —the same time I guess.

X.   Then where did you look after you looked down towards Harlan's ?   A. Then I turned my head and saw this freight train coming by.

X.   The freight train was going by the crossing at that time ?   A. Yes, sir.

X.   How far across did you get when you noticed a freight train passing ?   A. Well, I cannot say.   As soon as I saw it passing I started to back back.

X.   How far did you back back ?   A. About two or three feet.

X.   How close was it to you when you first saw the freight train crossing ?   A. What, the express ?

X.   No ; the freight train.   A. Well, about from here to that desk ( witness indicates the stenographer's desk in front of the Judges ).

X.   Then you stepped back about two or three feet ?   A. Yes, sir.

X.   And then stopped where ?.   A. I don't know where, but I stopped up against a freight train after I stepped back two or three feet.

X.   Do you mean to say you landed against a freight train as you stepped back?   A. I was knocked against it.

X.   How long had you been standing there, after you noticed the freight train, and stepped back, before you were hit ?   A. Well, I just got there and just about had time to back back when I got struck.

X.   What struck you there?   A.  The express.

X.   Coming in what direction?   A.  Coming from towards Harlan and Hollingsworth's.

X.   Coming from the south?   A.  Yes, sir.

X.   A passenger train?   A.  An express train, I guess.

X.   Was it a passenger train?   A.  I could not say whether it was a passenger train or not.

X.   Did you see what kind of a train it was?   A.  I did not have time to see it after I got struck.

X.   Did you see it before you were struck?   A.  No, sir.

X.   Did you see it after you were struck?   A.  No, sir.

X.   You have testified as to its speed.   How do you know how fast it was going?   A.  Well, by the way it struck me it must have been running a pretty good rate.

X.   Then you did not see the train before it struck you nor when it struck you nor afterwards?   A.  No, sir.

X.   You never saw its speed?   A.  I guess it was running about thirty miles an hour.

X.   Are you guessing merely?   A.  Well, the way it hit me it must have been running that way, I could not say positively.

X.   Where did it hit you?   A.  In the side.

X.   How far by the crossing was the freight train when you first saw the freight train?   A.  Well, I just had time to look up towards Harlan's and when I was looking up and turned my head the freight train was coming by.

X.   That is, it was passing Orange Street crossing?   A.  Yes, sir.

X.   Did you go towards the freight train after you saw it crossing?   A.  Not after I was struck.

X.   After you saw the freight train crossing, what direction did you go first?   A.  I was coming towards Front.

X.   Had you not stirred from the point where you first saw the freight train?   A.  Only to move back two or three feet.

X. Then your only movement was a backward movement after you saw the freight train ? A. Yes, sir.

X. Had you looked in the direction of Shipley or Market Street when you started to cross the track ? A. Not until after I had looked towards Harlan's ; then I turned my head.

X. Then you did not see the freight train until after it had started to pass, or had passed, or was going over Orange Street crossing? A. No, sir.

X. What makes you think the gates were up ? A. Well I looked, and they were up.

X. When ? A. That night.

X. When ? A. The twelfth of October.

X. What time of the night? A. I guess it must have been a quarter of, or ten minutes to nine.

X. How long before you started to go across the track, did you look to see whether the gates were up or not ? A. Well, I looked while I was walking up, coming up from the "Christine."

X. What gates did you notice were up ? A. The gates on this side.

X. The gates on the Front Street side ? A. No, sir ; towards the "Christine."

X. And did you notice whether the gates on the other side of the railroad were up or not ? A. Well, I could not say that. I was not over there.

*Charles Lynch*, a witness for plaintiff testified, concerning the accident, as follows :

*By Mr. Knowles :*

Q. Do you remember this accident at Railroad and Orange Streets about the 12th of October, 1902 ? A. Yes, sir.

Q. Where were you standing? A. The night of the accident I was standing on the south side of the railroad on Orange; the creek side on Orange Street beyond the railroad. I was about ten feet away from the railroad. John Mullin, the plaintiff, had

just left me and had started across the track. The gate on that side was then up when he started across the track. When he commenced to go over the track he said to me that he was going down to see his mother, and he looked up the track and could not see anything but this freight train that was going south, and this passenger was going north, and he was waiting for the freight train to pass when this passenger came down back of him and struck him, and it knocked him under the car, like, and I saw him when he fell.

Q. How far was the freight train up towards the French Street Station as he started across and as he looked up that way? A. I judge it was about the middle of the square, that is between Shipley and Orange.

Q. Did you notice at what speed that train was going? A. It was going a pretty good speed. No one could jump it. I guess it was going about eighteen or twenty miles an hour.

Q. Did you notice the speed of the express train as it came along? A. It was going pretty fast. I made the remark to them that she was going like hell, like that. I guess she was going twenty-five or thirty miles an hour; I should judge that.

Q. What train was it that struck him? A. I think it was the passenger. I am certain of it.

Q. What did the passenger train do after it struck him? A. Kept on going; did not make any stop at that place. After it was over I went up to Front Street to see an officer and tell him of the accident and did not see any one and went down to Front and Market and saw James McCormick, and he telephoned for the ambulance.

Q. At the time you say Mullin looked, did you see him when he looked towards Harlan and Hollingsworth's place? A. I could not say that; I did not pay that much attention, because I was half turned around myself.

Q. Did you look up towards Harlan and Hollingsworth's about the time he started across? A. Yes, sir.

Q.  Did you see anything coming?   A.  I did not see a thing. She came all of a sudden.

The defendant thereupon moved for a nonsuit on the ground that plaintiff, by his own testimony, was guilty of contributory negligence at the time of the accident; that he voluntarily and without necessity put himself in a place of danger by negligently stepping upon a railroad track to wait for a moving train to pass, upon which track a passenger train was approaching, and which he either saw or by the exercise of reasonable care ought to have seen, as the testimony on behalf of the plaintiff showed that the train must have been at that time in plain sight, and that plaintiff could not, under the law, be allowed to say that he looked, but did not see such train.

*Malin vs. Lake Shore Railroad Company, 49 Mich., 585; Minnig vs. Detroit R. R. Co., 64 Mich., 93; Glascoff vs. Central Pacific Railroad, 73 Cal., 137; Tully vs. Fitch, 134 Mass., 499; Tucker vs. New York Central Railroad Company, 124 N. Y., 308; Fowler vs. R. R. Co., 74 Hun, 141; Young vs. R. R. Co., 107 N. Y., 505; Reney vs. R. R. Co., 68 Hun, 495; Pennsylvania R. R. Co. vs. Pfuelb, 60 N. J. L., 278; Martin vs. B. & O. R. R. Co., 2 Marv., 123; Knopf vs. P., W. & B. R. R. Co., 2 Pennewill, 392.*

Counsel for plaintiff, in opposing the motion for a nonsuit, cited the following authorities:

*Railway vs. Schneider, 45 Ohio, 678; Pennsylvania R. R. vs. Sleymyer, 118 Ind., 305; Schmidt vs. Burlington R. R., 75 Iowa, 606; Thompson on Negligence—Title "Crossings," 733; Palmer vs. N. Y. Central R. R. Co., 112 N. Y., 232.*

BOYCE, J.:—We decline to grant the nonsuit.

The defendant then proved, among other things, that the defendant railroad company at the urgent request of the wife of the plaintiff had presented the plaintiff with $100 with which to buy a

MULLIN vs. P., B. & W. R. R.          165

CHARGE—VERDICT.

pair of artificial legs—not recognizing thereby in any way their liability to the plaintiff—that the plaintiff in consideration thereof signed a release, whereby the defendant was relieved of all liability for the accident to him.

Said release was admitted in evidence.

The plaintiff contended that when he signed said release he did not understand the effect of it and that the same was obtained by misrepresentation.

BOYCE, J. :—We have carefully considered the arguments of counsel upon the defendant's prayer for binding instructions to the jury. And, in view of the release in evidence in this case, which was not before us in the motion for a nonsuit, as well as upon the ground of contributory negligence, respecting which we then entertained considerable doubt ( the law pertaining to which, however, we had not then the time to fully examine and consider ), we are constrained to direct a verdict for the defendant.

Gentlemen of the jury :—We instruct you to return a verdict for the defendant.

                                        Verdict for defendant.